TuRLF.y J.
delivered die opinion of the court.
1. Did the court err in overruling the demurrer and compelling the defendants to answer? We think not. The bill is framed with a view to an account, and a specific execution of the contract, both legitimately within the jurisdiction of a court of Chancery; and’the necessary parties thereto, were the administrators of George Evans, the representatives of the personal estate, which was responsible upon the account for moneys received by him during his lifetime, and his heirs at law and widow, as tertenants, whose rights were to be affected in the real estate, by the decree for 'specific performance. And it is no objection to say, that upon the hearing, complainant may fail to make out a case for specific performance, and therefore the heirs and widow need not have been made parties, for parties are necessarily made according to the charges in the bill, and not the result of the decree; and moreover, supposing the bill to be only for an account, then there is no charge against the heirs at law and widow of the intestate Evans, and though they might have demurred, because they were made parties without being charged, yet the administrators could not, because they were charged and properly responsible for any decree which might be rendered against them as the representatives of Evans.
2. Did the court err in refusing to permit an amendment of the answers of the administrators after the interlocutory decree, so as to enable them to plead the statute of limitations of two years, or in refusing to grant a rehearing for the same purpose ? We think not. The amendment of Chancery pleadings is always allowed with great liberality until after the testimony is taken and publication passed, except in case of answers put in on oath, which for obvious reasons will not easily be chang *295 ed. But after the examination of witnesses and publication passed, no part of the pleadings can be altered or added to, but under very special circumstances, or in consequence of some subsequent event; Mitford’s Plead; 259.
In this case, the testimony had not only been taken and publication passed, but an interlocutory decree had been made deciding upon the merits of the case, and an account ordered to enable the Chancellor to make a final settlement of the matters in dispute between the parties. In order to receive the plea, the interlocutory decree must have been set aside, and the case again opened for proof upon an entirely new and different issue from that first made up, and all that had been previously done set aside as useless; a practice, novel in itself, and unsupported as is believed by any well adjudicated precedent; and this is not asked in consequence of any subsequent event, nor under any very special circumstances as the cóürf believe, for the defence sought thus to be used, was purely of a legal nature, in existence at the time the pleadings were closed, within the knowledge of the defendants, and nbt resorted to, merely because it was believed that under the circumstances attending the case, it could not be effectually! used. To establish such a precedent would be to enable de-j fendants to practice upon the courts. The use of the plea of¡ the statute of limitations is in bad odour; no man would wil-’ lingly use it, if he could gain his case upon its merits; if after' having endeavored to do so, he may then ask and obtain leave to file it in almost every case where it constituted a defence, there would be two hearings, and two decrees, before there would be an end to the proceedings. If the court then did not err in refusing to set aside the interlocutory decree and receive the plea, afortiori, it did not err in refusing a rehearing.
3. Did the court err in decreeing that the administrators of George Evans should pay to complainant, Cocke, and the representatives of Jack, one half of the tolls received by Evans at the bridge, from the 9th day of January, 1823, up to the third day of March, 1826, after deducting therefrom the sum necessary to pay for repairs made by Evans in 1823, and one half the tolls received at the ferry established at the bridge af *296 ter it was destroyed by the flood up to the time of the death of Evans in 1828, deducting therefrom a sum sufficient to pay one half the expenses of said ferry during that period of time? We think not..
The bridge had been built at the joint expense of the company, and by the articles of agreement they had mutually covenanted with each other, that the nett proceeds should be divided amongst them once a month. From the 9th day of January, 1823, up to the 3rd day of March, 1826, Evans had kept the’bridge and received all the tolls, and had made no payment to his co-partners. Nothing can be plainer than that in equity and good conscience, he was bound to pay to them their share of the profits, after deducting therefrom a sum sufficient to pay their portion of the repairs.
By the articles of agreement, Evans covenanted with his co-partners, “that in case the bridge should at any time be swept away, or in any manner impaired so that it could not be crossed, that then he would well and truly account with, and pay to them one fourth part each, of all the ferriages that might be collected during the time said bridge should continue impassable, they paying each one-fourth part of the expense of keeping up the ferry. After the bridge was destroyed, the ferry was started by Evans and kept up by him till his death, he received the tolls and made no division with his co-partners. But it is said he was not bound to do so because,
1. The contract to-divide the profits of the ferry, was only intended to cover that period of time between the destruction of the bridge and its rebuilding; and that upon the destruction of the bridge the co-partners of Evans had determined never to rebuild, and therefore the contract ceased to be obligatory upon Evans. There is no evidence of such a determination. Cocke says in his examination upon interrogatories, that he, Evans, and Jack consulted together about the propriety of rebuilding the bridge, and that they mutually agreed, that it would be better not to do so until they knew whether the road would be changed, and that in the mean time it would be better to keep up the ferry, which was done by Evans till his death in 1828, about which period the road was changed, as *297 had been feared, at which time, and not before, the court feels authorised in saying that all idea of rebuilding the bridge was totally abandoned.
2. Because Cocke and Jack had paid no portion of the expense of the ferry, and that it would, therefore, be iniquitous for them to claim a portion of the profits. It is a sufficient answer to this, to say, thát they were bound by their contract with Evans to do so upon his application at any time, tod that he could not. by his act in going to all the expense himself, without calling upon them for their contributive share¿ deprive them of the right to their division of the profits; all he could ask, being an indemnity for their share of the expenses, before he should be called upon to distribute the profits.
But it is said, thirdly, that the statute of limitations of threé years, which is relied upon in the answers of the administrators of Evans, operates as a bar to the recovery of the profits, arising either from the bridge or ferry. The payment thereof, is secured by express covenant under seal, against which the statute of limitations does not run, and moreover, Evans was the partner of Cocke and Jack, andhis possession of the money received was their possession, until he claimed to hold it adversely to their right, of which there is no proof.’ Then the Statute of limitations could not begin to run until his death, and three years did not elapse from that period of time till the bill was filed.
4. Did the court err in decreeing an account and distribution of the profits made at the ferry in Bristow’s bend, after the destruction of the bridge? We think it did.
By the articles of agreement, Evans covenanted with his co-partners, that he would not keep a ferry in Bristow’s bend, but would at any time, if called upon-, executé to them a deed of conveyance in fee simple, making them equally interested with hiim in the said ferry and banks. The intention of this covenant was that the bridge might not be injured by the ferry, and the design of the conveyance was not, that his co-partners might become joint owners of a ferry, but that they might have it in their power thereby to prevent his establishing the feny, contrary to his covenant, and driving *298 them for redress into a court of Chancery, The conveyance was never made, and there being no covenant to account, but merely a covenant not to act, there is nothing upon which a court of Chancery can operate; the parties must he left to their remedy at law to recover damages-, if their covenant he broken*
5. Did the circuit court err in decreeing a specific execution of the contract for a conveyance of the ferries and banks of the river? We think it did.
The specific execution of contracts is decreed at the sound discretion of a court of Chancery, but it is a jurisdiction so important, and has been so long and so frequently exercised, that the principles by which it is governed, are nearly as well settled as, if it were regulated by positive enactment.
In order to entitle a party to a specific performance of a contract, it must be fair, certain, just, equal in all its parts, and forjan adequate consideration. Cutheral vs. Ogilvie, 1 Dess. 257. A specific performance of a contract will not be decreed, where it is hard or unreasonable in itself, or where-from material change of circumstances since the contract, the performance would be attended with any particular hardship. Perkins vs. Wright, 3 Har. and McHen. 324.
To entitle the complainant to the specific performance of a contract, it must appear not only that the contract was in all respects full, fair and honest in the beginning, but that the performance of it may be fairly and conscientiously required. Carbury vs. Tannehill, 1 Har. and J. 224.
The court will not interfere to decree a specific performance, if there be suspicion of unfairness, or if it would be a hardship on the defendant. Hall vs. Ross, 3 Hay. 262.
To apply these principles. In 1812, Evans kept a public house and ferry on the road leading through East Tennessee to Kentucky, at the point where it crossed Clinch river. This road being much travelled, it was an object of great importance to every person by whose house it passed, as it gave|an opportunity of selling all kinds of provisions and bread stuffs readily, and at the highest prices. The consequencej^was, phat every man who had any reasonable prospect of having its ocation changed, so as to bring it past his farm, was always active in endeavoring to do so. It is manifest that this whole *299 section of country was in commotion upon this subject, and to such an extent had it operated on George Evans, that for the purpose of securing himself from loss by any anticipated change, he had purchased the ferry below him on Jenning’s road; and the one above him in Bristow’s bend.
Not content with the security which this might afford him, he sought to strengthen his interest by associating with him the complainant, John Cocke, Martin Beaty and John F. Jack, men of wealth and influence in the country; and believing that a bridge would better secure the permanency of the road than a ferry, he proposes to them to unite and build one in partnership, and as an inducement thereto, he promises to convey to them a joint interest in the banks of the river at his ferry, and to furnish all the. materials at all times for the building or repairing of the bridge, and until the bridge could be erected, that he would divide with them in equal proportions, all the profits made at his ferry, and that he would not keep a ferry on Jenning’s road, nor in Bristow’s bend, but would, on application, convey to them an equal interest in said ferries.
Who does not see that all the advantages of this ’contract are on the part of Cocke, Jack and Beaty, and that nothing but a desire to have a bridge erected, and to have the influence of their names in preventing a change of the road, could have induced Evans to have made such a contract. The erection and permanent continuance of the bridge, was the only consideration for this contract, and all its stipulations were for that purpose. The conveyance of the channel of the river and banks, at Evans’ ferry, was for a foundation for the pillars and abutments, and not to make Cocke, Jack and Beaty interested in the ferry; and the conveyance of an equal interest in the ferries on Jenning’s road and in Bristow’s bend, was not for the purpose of keeping up the ferries, but for putting them down, in order that they might not injure the bridge. The object of Evans was attained; the bridge was built, and the effect desired was produced. There was no change of the road till after 1826, when the bridge was destroyed by a flood, and perhaps, if it had been rebuilt according to the spirit of Evans’ contract, there might have been none yet. But this was neglected to bo done, and in 1828, *300 the evil Which Evans had foreseen, and had so long been - guarding against, came upon him; the road was changed and the value of his property destroyed. The circumstances under which he made his contract were changed; the consideration upon which it was founded failed. All idea of rebuilding the bridge was abandoned, from 1828 the time the road was changed, and yet in 1830, Cocke, the complainant, comes forward and asks the court for a specific execution of the contract, to let him into the enjoyment of Evans’ two ferries as tenant in common. Such was never the design of the contract; all the conveyances were covenanted to be made upon the idea that the bridge was to be erected and continued, and were designed for its supports, and it never entered into the consideration of the parties, that the day was ever to arrive, when the bridge was to be converted into ferries for the use of the contracting parties. This would have been a gift by Evans of three fourths of the interest of his ferries to strangers, an unaccountable fatuity on his part. We therefore think that at the time the bill was filed, a material change in the nature of this contract had taken place,” and that it would be hard and unreasonable to decree specific execution.
From this view of the case, it will be seen that we reverse the decree of the Chancellor, dismiss the bill as to the heirs and widow of George Evans, and give a decree against his administrator, for the one half of the amount of money received by him as toll keeper of the bridge from the 9th day of January, 1823, up to the 3rd March, 1826, after deducting therefrom, a sum sufficient to pay for one half of all repairs and expenses of every kind and description during that period of time; and also for the one half of the amount of money received from the ferry after the bridge was destroyed, up to the time of his death, deducting therefrom one half of the necessary expenses of putting into operation and keeping up said ferry. For the purpose of ascertaining what the amount is, we take the report of the Clerk and Master of the Chancery court, which seems to have been examined with great care by the Chancellor, and direct that the amount there specified, viz: twelve hundred and forty six dollars seventy eight peats, with interest to this time, be the sum decreed by this *301 court. We also decree that the costs in this cause he divided into four equal parts, one part of which shall be paid by complainant, Cocke, one by Jack’s heirs, one by Evans’. heirs, and one by Evans’ administrators.
Decree reversed.